**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **HOLLY HUGHES,** individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>**HEALTH GORILLA, INC.,**<br><br>Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br>(DEMAND FOR JURY TRIAL) |

Plaintiff Holly Hughes, individually and on behalf of all others similarly situated ("Plaintiff"), through counsel, for her Class Action Complaint against Health Gorilla, Inc. ("Defendant"), states as follows:

## INTRODUCTION

1.      Plaintiff brings this class action lawsuit to hold Defendant accountable for granting access and failing to prevent multiple fraudulent actors from gaining unfettered access to the patient records of millions of healthcare patients, including Plaintiff, through the networks used by healthcare providers to share information with other healthcare providers for treatment purposes. Defendant served as the gateway for multiple bad actors to access, copy, and sell patient records for illicit and illegal purposes to the detriment of Plaintiff and Class members.

2.      Defendant does business as an "Implementer," in the Carequality framework, and a Qualified Health Information Network ("QHIN") in the Trusted Exchange Framework and Common Agreement ("TEFCA"). The Carequality framework and TEFCA are two national frameworks responsible for more than a billion patient-record exchanges between healthcare industry participants every month. TEFCA is a federally sponsored interoperability framework for

healthcare providers to exchange patient records to facilitate coordination and continuity of care for patients nationwide, and the Carequality framework is a similar private network. Both the TEFCA and Carequality framework are administered and maintained by the non-profit organization The Sequia Project.

3. Certain of Defendant's customers abused these networks for illicit commercial gain on Defendant's watch. Through thinly veiled disguises, they pose as healthcare providers and falsely certify that they are accessing electronic patient records over these networks for treatment purposes. Once they retrieve the records through network, they use or sell the records for profits and commercial exploitation.

4. As an Implementer/QHIN providing access to these bad actors, Defendant was contractually, ethically, and legally responsible for vetting their qualifications to access the system prior to granting them access, including conducting adequate and robust due diligence prior to approving their applications, and monitoring and verifying that their activity over the network was consistent with legitimate uses. Defendant failed on all counts.

5. Defendant's failures to safeguard and protect patient records of Plaintiff and Class members and to maintain the integrity of the vast interoperability framework on which principles of continuity of care rely constitute moral, ethical, and legal violations of the highest order.

6. The bad actors were not vetted and their activities were consistent with abuse. Despite these red flags, Defendant failed to take reasonable and necessary actions to put a stop to their conduct, as it was required to do. To make it worse, Defendant attempted to conceal their conduct by defending the action of the bad actors and giving pretextual reasons for their suspicious behavior when others raised concerns.

7.     As a result of Defendant's failures, Plaintiff's and Class members' patient records were accessed by these bad actors.

8.     On January 13, 2026, Epic Systems Corporation and certain other healthcare providers and business associates filed a lawsuit seeking injunctive relief against Defendant and a myriad of other entities and persons, to put a stop to the rampant fraudulent access, use, and disclosure of confidential patient records.

9.     Upon information and belief, Plaintiff's electronic health records were accessed for unauthorized purposes by one or more of the fraudulent actors identified in the January 13, 2026, Epic lawsuit. The bad actors identified in the breach were RavillaMed, Mammoth Path Solutions and MammothDx, SelfRx, and GuardDog Telehealth. Plaintiff never sought treatment from any of these companies. As a result, Plaintiff's and Class members' complete medical records were shared without authorization and without lawful purpose, by and through Defendant, to the bad actors (the "Data Breach").

10.    Upon information and belief, these bad actors accessed the complete data set relating to Plaintiff's health and wellbeing, clinical and administrative data, doctors' orders, office visit notes, procedures, consultations, emergency department visits, laboratory results, treatment information, and other related health information. All of this information was required to be kept confidential under patient-physician privilege and HIPAA.

11.    On information and belief, the bad actors sold or used Plaintiff's and Class members' patient record data and the information that could be inferred therefrom to make prohibited targeted advertising, insurance claims decisions, and other unlawful, unscrupulous, and unethical practices.

12. Plaintiff brings this lawsuit to obtain legal and equitable relief arising out of Defendant's unlawful actions and omissions.

## PARTIES, JURISDICTION, AND VENUE

13. Plaintiff is a citizen and resident of Steubenville, Ohio, where she intends to remain.

14. Defendant Health Gorilla, Inc. is a Delaware corporation with its principal place of business in Coral Gables, Florida.

15. The Court has jurisdiction under 28 U.S.C. § 1332(d) because this is a class action, there are 100 or more proposed Class members, Plaintiff and Defendant are diverse parties, and the amount in controversy exceeds $5 million.

16. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to this action occurred within this District and Defendant resides in this District.

## FACTUAL BACKGROUND

**A. TEFCA and the Carequality Interoperability Framework**

17. TEFCA is a federal statutorily-created framework for nationwide standardized sharing of electronic patient records. It was created by Congress in the 21st Century Cures Act. It was launched in 2023 and provides the network, directories, standardized procedures, and data use agreements between healthcare providers, patients, payers, and government agencies.

18. "TEFCA establishes a universal floor for interoperability—creating a path for data to be shared beyond proprietary boundaries. TEFCA enables providers, payers, public health professionals, and patients to access and securely share health information regardless of where the information is stored. This helps providers coordinate patient care and ensures that patient data follows the patient, even when switching providers, among a wide variety of additional benefits."[1]

---

[1] https://healthit.gov/policy/tefca/ (last visited Mar. 24, 2026).

19.     Carequality is a non-profit organization that administers and maintains a central directory that includes the electronic endpoints that enable communications primarily among healthcare providers. Carequality is a "national-level, consensus-built, common interoperability framework to enable exchange between and among health data sharing networks. Carequality defines the technical and policy agreements to standardize data flow among networks of electronic health record vendors, record locator service providers, and the healthcare providers that use these vendors' networks.

20.     Carequality and TEFCA both are a "network of networks" that work alongside one another to facilitate the sharing of electronic patient records. These frameworks are available for health information networks, vendors, and payers.

21.     Once a user is entered in the frameworks' directory and distributed throughout the network, the user can query and take patient's records of other participants in the network, as long as it asserts one of a limited menu of valid purposes, *e.g.*, for treatment, payment, research, etc. Typically, such a query requires basic patient information (name, address, date of birth). With that basic information and certification of a valid purpose as inputs, users gain instant access potentially to complete records of the queried subject.

22.     Because of this ease of access, the network relies on Defendant to vet its users before signing them up, and to actively monitor its users' conduct to ensure that they are using their access permissibly and appropriately, and only accessing the minimum necessary for the stated purpose of their requests.

### *Defendant Agreed to Vet and Monitor the Bad Actors*

23.     To join the Carequality framework, Defendant executed a contract called a Carequality Connected Agreement ("CCA"). The CCA requires Defendant to impose Carequality

Connection Terms ("CC Terms") as a contract on all entities Defendant connects to the Carequality network.

24.     Sections 7, 15.2, and 15.4 of the CCA require Defendant to ensure that its users comply with the CC Terms and all applicable components of the Implementation Guides and Carequality Policies.

25.     Section 15.3 of the CCA requires Defendant to uniquely identify each user prior to granting access to the framework.

26.     Section 13 of the CCA requires that Defendant "shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides." Section 13 specifically limits entities that are not "covered entities" under HIPAA or government entities to using the framework for permissible purposes.

27.     On information and belief, the bad actors who abused the system on Defendant's watch agreed to standard CC Terms.

28.     TEFCA requires participants to agree to the "Common Agreement."

29.     On information and belief, Defendant agreed to the Common Agreement.

30.     Section 7.4.1 of the Common Agreement provides that "[t]o the extent not prohibited by Applicable Law, [Defendant] shall be responsible for its acts and omissions, and the acts or omissions of its Participants and their Subparticipants." By agreeing to this requirement, Defendant agreed to be responsible for the actions of the bad actors who stole Plaintiff's and Class members' patient records.

31.     The applicable contract provisions require Defendant to abide by terms of the agreement and to require that users do so also. Section 13.2.2 of the Common Agreement make Defendant responsible "for taking reasonable steps to confirm that all of its Participants and

Subparticipants are abiding by the ToP, all applicable SOPs, and any decisions made pursuant to Section 16.3."

32.     Defendant is also required by Section 13.2.2 of the Common Agreement to notify its Participants and Subparticipants when they are in breach of applicable rules, and to terminate and suspend Participants and Subparticipants when warranted.

33.     Even after a user obtains an approval to access the framework, it must certify a specific permitted purpose for every access request. The level of access is dependent on the stated purpose.

34.     For example, when a user certifies a request is for "treatment purposes," it is granted full patient record access. The end point storing the responsive patient information (such as Plaintiff's healthcare provider or its vendor) automatically responds with data commensurate with the stated purpose to fulfill the request. Pursuant to the CCA and Common Agreement, generally speaking, the responding entity is required to respond to the request.

35.     Only healthcare providers are permitted to certify a request for treatment purposes to gain access to full patient records from participating organizations. Other legitimate purposes including payment, healthcare operations, public health activities, etc. provide access to a more limited subset of information necessary and appropriate to meet those purposes. Non-treatment providers, such as insurance companies, are not permitted to gain access to full patient records. Treatment providers, on the other hand, are appropriately provided complete access.

36.     Defendant is fully aware of the sensitivity of the information its network transmits. Defendant is also aware of the potential for abuse such access to these frameworks provides.

***The Data Breach Was Caused By Defendant's Failures***

37.     Defendant failed to take adequate steps to vet candidates for its network. Notably, according to the Epic complaint (¶¶ 132–146), Defendant onboarded the same entities even after they were rejected by others because investigations revealed that their activities were not for treatment purposes, as stated. Defendant did not identify the same suspicious behavior, or did not care, and Defendant onboarded them and allowed them to engage in their fraudulent schemes undisturbed.

38.     For example, one entity it onboarded was named Integritort. The use of the word "tort" in the name should have set off alarms that it was a marketer to mass tort and class action law firms.

39.     Another entity called Constant Care Health queried the network for more than 59,000 records while sharing only 80 back before Defendant was forced to end CCH's access. This heavily skewed one-way traffic, or "nonreciprocal" sharing, is highly suspicious. Typical healthcare providers share and query at a 1:1 ratio, and not volumes that are out of proportion to their size.

40.     Defendant onboarded RavillaMed after it was already kicked off of the Carequality network by another Implementer. RavillaMed engaged in unusual activity over the network, requesting tens of thousands of complete patient records per month in a non-reciprocal manner.

41.     RavillaMed is closely associated with and has common ownership and management with another entity, LlamaLab, that openly markets to law firms a service providing for same-day medical records and related services.

42.     Mammoth Path Solution and Mammoth Dx have taken over 140,000 patient records through Carequality and TEFCA from Epic's clients alone in highly non-reciprocal record exchanges. In an attempt to appear more legitimate, these companies began to add "clinical

information" into the patient records to make it look as though they were treating patients. But the information they added was fictional.

43.     GuardDog and SelfRx also requested patient records in huge numbers in a non-reciprocal pattern, and were managed by individuals who had a professional history as mass tort medical consultants.

44.     Defendant failed to put a stop to the bad actors, even after it had more than enough knowledge of their abuse of the network. Defendant not only failed to stop it, but also defended the bad actors from attempts by other organizations to enforce the rules, deflecting blame, and inventing pretexts to keep the scheme alive. When others confronted Defendant with evidence of abuse, Defendant ignored the obvious and refused to take the actions to terminate the bad actors' access to the networks.

### *The Data Breach Was Foreseeable*

45.     It is common knowledge that businesses that store personal information are likely to be targeted by fraudsters and criminals, to hold the systems for ransom and to sell the personal data on the black market so the buyers can commit identity theft and make other illicit profits off of the data.

46.     The intimate, comprehensive, and confidential financial and health data at issue here is some of the most valuable to identity thieves, advertisers, lenders, creditors, insurers, and other businesses.

47.     Defendant knew or should have known that it was an ideal target for abuse and that bad actors with nefarious purposes would attempt to access the network for illegitimate reasons by posing as treatment providers when they were not and falsely requesting records for treatment purposes.

9

48.     Indeed, the FBI has publicly warned the healthcare industry to bolster its data security against the increasing frequency and sophistication of attacks. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information ("PHI") and/or Personally Identifiable Information ("PHI")."[2]

49.     The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[3]

50.     Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset to criminal organizations and unscrupulous actors in legitimate businesses. According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[4] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[5] This

---

[2] Jim Finkle, FBI warns healthcare firms that they are targeted by hackers, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warnshealthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820, (last visited Mar. 24, 2026).
[3]  Identity Theft Resource Center, 2018 End-of-Year Data Breach Report, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf, (last visited Mar. 24, 2026).
[4] 2019 HIMSS Cybersecurity Survey, https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last visited Mar. 24, 2026).
[5]  Eyal Benishti, How to Safeguard Hospital Data from Email Spoofing Attacks, Chief Healthcare

trend has continued more recently. Data breaches have become alarmingly commonplace in the U.S. In 2021, data breaches increased by nearly 70% over the previous year, which is over 20% higher than the previous all-time high.[6]

51.     Furthermore, the healthcare sector was the easiest "mark" among all major sectors in 2021, meaning it had the highest number of data compromises and categorically had some of the most widespread exposure per data breach.[7] According to the 2021 Healthcare Information and Management Systems Society Cybersecurity Survey, 67% of participating hospitals reported having a significant security incident within the last twelve months, with a majority of those being caused by "bad actors."[8]

52.     Healthcare providers and vendors that maintain healthcare provider data "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers.[9]

53.     Defendant knew the importance of guarding the gateway to patients' PII and PHI entrusted to it and of the foreseeable consequences if that data was disclosed to bad actors.

Executive    (Apr.    4,    2019),    https://www.chiefhealthcareexecutive.com/view/how-to-safeguardhospital-data-from-email-spoofing-attacks, (last visited Mar. 24, 2026).
[6] *2021 Annual Data Breach Year-End Review*, ITRC, (Jan. 2022), https://www.idtheftcenter.org/publication/2021-annual-data-breach-report-2//
[7] *Id.*
[8] *2021 HIMSS Cybersecurity Survey*, Healthcare Information and Management Systems Society, Inc., accessible at: https://www.himss.org/resources/himss-healthcare-cybersecurity-survey (last accessed Mar. 16, 2022).
[9] Benishti, Eyal, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH (Apr. 4, 2019), https://www.idigitalhealth.com/news/how-to-safeguard-hospitaldata-from-email-spoofing-attacks.

11

Defendant failed to implement and maintain adequate due diligence, vetting, and monitoring practices and procedures to prevent the Data Breach from occurring.

54. Defendant was notified by Epic in September 2022 that certain entities were accessing patient records through its network, and therefore had knowledge at least as early as then that bad actors were manipulating the network to get patient records for prohibited purposes in violation of the Carequality and TEFCA rules and the law.

55. Defendant has the resources and responsibility to invest in the necessary data security and protection measures commensurate with the stakes and its role. Yet, Defendant failed to undertake adequate analyses and testing of its own systems and other data security measures to avoid the failures that resulted in the Data Breach.

### *Patient Records Are Highly Valuable*

56. The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[10]

57. Stolen PII and PHI are valuable commodities to identity thieves. The purpose of stealing patient records, like in this Data Breach, is to use the data for illicit purposes or to sell the data for profit to other criminals who buy the data and misuse it. Health records are so valuable because it is so broad, and it can therefore be used for a wide variety of criminal activity such as creating fake IDs, buying medical equipment and drugs that can be resold on the street, or

---

[10] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) (last visited Mar. 24, 2026). http://www/ftc/gov/speeches/harbour/091207privacyroundtable.pdf.

combining patient numbers with false provider numbers to file fake claims with insurers, opening new financial accounts, obtaining government benefits, filing fraudulent tax returns, giving false information to police during an arrest, taking out loans, and to obtain medical services.[11]

58.     Advertisers, credit agencies, and merchants covet medical records because virtually every other aspect of consumer behavior can be recorded, tracked, and analyzed. On the other hand, medical records are generally off limits for these companies but they contain reams of valuable insight into consumers' interests, behaviors, purchase history, and ability to pay back a loan.

59.     According to a Trustwave report, a healthcare data record may be valued up to $250 per record on the black market compared to $5.40 for the next highest value (a payment card).[12]

60.     Healthcare related data is among the most sensitive and personally consequential when compromised.  "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery" reported Pam Dixon, executive director of World Privacy Forum.[13] A report focusing on health care breaches found that the "average total cost to resolve an identity theft related incident came to about $20,000."[14]

---

[11] *What to Know About Identity Theft,* FED TRADE COMM'N (April 2021), https://consumer.ftc.gov/articles/what-know-about-identity-theft/
[12] https://www.securelink.com/blog/healthcare-data-new-prize-hackers citing https://trustwave.azureedge.net/media/16096/2019-trustwave-global-security-report.pdf?rnd=132056250120000000. (last visited Mar. 24, 2026).

[13] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News (Feb. 7 2014), https://khn.org/news/rise-of-indentity-theft/ (last visited Mar. 24, 2026).
[14] Elinor Mills, Study: Medical Identity theft is costly for victims, CNET (Mar.3, 2010) https://www.cnet.com/tech/services-and-software/study-medical-identity-theft-is-costly-for-victims/ (last visited Mar. 24, 2026).

61.     Medical information is some of the highest value data to criminals.[15] In fact, according to the FBI's Cyber Division, healthcare records can be sold by criminals for 50 times the price of stolen Social Security numbers or credit card numbers. By one estimate, PHI can sell for as much as $363 according to the Infosec Institute.[16] And files containing PHI can be bought on the black market for between $1,200 and $1,300 each.[17] This data, as one would expect, demands a much higher price on the dark web.  Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[18] Likewise, the FBI has warned healthcare organizations that their data is worth 10 times as much as personal credit card data on the black market.[19]

---

[15] Calculating the Value of a Data Breach -What are the Most Valuable Files to a Hacker" Donnellon McCarthy Enters (July 21, 2020) https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited Mar. 24, 2026).
[16] Data Breaches: In the Health Care Sector, Center for Internet Security, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Mar. 24, 2026).
[17] Elizabeth Clarke, Hackers Sell Health Insurance Credentials, Bank Accounts, SSNs, and Counterfeit Documents Secure Works (July 15, 2013), https://www.secureworks.com/blog/general-hackers-sell-health-insurance-credentials-bank-accounts-ssns-and-counterfeit-documents (last visited Mar. 24, 2026).
[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonaldata-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[19] Stolen PHI health credentials can sell for up to 20 times the value of a U.S. credit card number, according to Don Jackson, director of threat intelligence at PhishLabs, a cyber-crime protection company who obtained his data by monitoring underground exchanges where cyber-criminals sell the information. *See* Humer, Caroline & Finkle, Jim, *Your medical record is worth more to hackers than your credit card*, REUTERS, (Sep. 24, 2014), https://www.reuters.com/article/uscybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-cardidUSKCN0HJ21I20140924. Dark web monitoring is a commercially available service which, at a minimum, AHS can and should perform (or hire a third-party expert to perform).

14

62.     Thus, the compromised patient records of Plaintiff and Class members have a high value in both legitimate and black markets. Plaintiff and Class members have now been injured by unauthorized third parties profiting off of the value of their confidential information.

***The Data Breach Justifies Reasonable Mitigation Efforts***

63.     It is well recognized that in data breaches, fraudulent activity may not show up for prolonged periods of time—potentially years after PHI and PII are divulged. And victims only discover their harms after they receive collection letters for debts they never incurred.[20]

64.     Despite Defendant's failure to protect Plaintiff's and Class members' PII and PHI, Defendant has not offered Plaintiff or Class members any recourse.

65.     Plaintiff and Class members have taken reasonable steps to maintain the confidentiality of their health-related information. Plaintiff and Class members, as current and former patients of providers who rely on the frameworks relied on Defendant to honor its contractual and ethical obligations to guard the gateway to their records, to ensure the integrity of the system, the confidentiality of their records, and to allow only authorized disclosure of their information.

66.     In an effort to mitigate the risk and potential losses, Plaintiff will have to spend time reviewing treatment information, health records, bills, financial transaction records, and insurance information looking for suspicious activity. To be safe, she has to cast a wide net and assume that everything about her was taken and used for the worst possible purposes. She has to assume that her patient records are in the hands of identity thieves that have already profited off of her data. Plaintiff will continue to spend time in the future monitoring accounts, insurance

---

[20] The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches, Experian (Apr. 2010) https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Mar. 24, 2026).

claims, explanations of benefits, patient records, doctor's notes, and she will remain at risk for future identity theft (financial and medical). These mitigation and monitoring efforts are reasonable in light of the current and future risk of identity theft.

67.     Plaintiff also must deal with her emotional distress, fears, uncertainties, and discomfort presented by the risk that bad actors inserted false treatment information in her records that could end up hurting her when a doctor mistakenly relies on false information in her treatment. Indeed, according to the Epic complaint (*see e.g.*, ¶ 129), the bad actors that Defendant shared Plaintiff's and Class members' data with were inserting fake information into the records of patients they queried to conceal their fraudulent purposes. Typical treatment providers will query a record and then add information to that patient's record in the course of treating the patient, resulting in a reciprocal exchange of information. However, Defendant's users were engaged in non-reciprocal queries where they only took records without adding information. When red flags about their suspicious activities were raised, the users changed their names, evaded responsibility and then came back with a way to conceal their activities by adding false information to the records they requested to make their activities resemble legitimate activity. As a result, Plaintiff might have false information in her records that in the future could cause a doctor to make an incorrect diagnosis or recommend a non-optimal (or worse) course of treatment.

**B.      Defendant's Conduct Violates HIPAA and Industry Standard Data Security Practices**

Title II of HIPAA contains what are known as the Administrative Simplification provisions.[21] 42 U.S.C. §§ 1301, et seq. HIPAA provides specific privacy rules that require

---

[21] HIPAA lists eighteen types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, inter alia: names, addresses, any dates including dates of birth, social security numbers, and medical record numbers.

comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII is properly maintained.[22]

68.     The Data Breach resulted from Defendant's failures to comply with safeguards mandated by HIPAA regulations and industry standards. The security failures include, but are not limited to:

a.     Failing to maintain an adequate data security system to prevent data loss;

b.     Failing to mitigate the risks of a data breach and loss of data;

c.     Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

d.     Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

e.     Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

f.      Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

g.     Failing to protect against any reasonably-anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding

---

[22] *See* 45 C.F.R. § 164.306 (Security standards and General rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

h.  Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

i.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. §164.312(a)(1);

j.  Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, et seq.;

k.  Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

l.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

***Plaintiff and Class Members Suffered Long-Lasting Damages***

69.  As a direct and proximate result of Defendant's wrongful actions and inaction, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which

18

they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

70.    As a result of the Defendant's failure to prevent the Data Breach, Plaintiff and Class members have suffered, will suffer, or are at increased risk of suffering:

a.    The compromise, publication, theft and/or unauthorized use of their patient records to unknown third parties;

b.    Unauthorized use and misuse of their information;

c.    The loss of the opportunity to control how their information is used;

d.    Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

e.    Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

f.    The imminent and certain impending injury flowing from potential fraud and identity theft posed by their records being placed in the hands of criminals;

g.    The continued risk to their records are subject to further breaches so long as Defendant fails to undertake appropriate measures; and

h.    Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members.

71.     In addition to a remedy for the economic harm, Plaintiff and Class members maintain an undeniable and continuing interest in ensuring that their patient records are secure and remain secure.

## CLASS ALLEGATIONS

72.     Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Nationwide Class:

> **All persons in the United States whose patient records were disclosed in the Data Breach.**

73.     Excluded from the class are Defendant and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

74.     Plaintiff reserves the right to, after conducting discovery, modify, expand, or amend the above Class definition or to seek certification of a class or Classes defined differently than above before any court determines whether certification is appropriate.

75.     **Numerosity**. Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are thousands of members of the Class, if not more. The number of impacted individuals remains unknown and unreported, and Plaintiff believes additional entities and persons may have been affected by the Data Breach. The precise number of Class members, however, is unknown to Plaintiff. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

20

76.     **Commonality and Predominance.** Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. These common questions include, without limitation:

a.     Whether Defendant violated the laws asserted herein;

b.     Whether Defendant knew or should have known that its data environment and security measures created a risk of a data breach;

c.     Whether Defendant controlled and took responsibility for protecting Plaintiff's and the Class members' data;

d.     Whether Defendant's security measures were reasonable considering the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

e.     Whether Defendant owed Plaintiff and Class members a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII it collected, stored, and maintained from Plaintiff and Class members;

f.     Whether Defendant owed Plaintiff and Class members a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the PHI it collected, stored, and maintained from Plaintiff and Class members;

g.     Whether Defendant's failure to adequately secure Plaintiff's and Class members' data constitutes a breach of its duty to institute reasonable security measures;

h.  Whether Defendant's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiff's and Class members' data;

i.  Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

j.  Whether Plaintiff and Class members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect its data systems; and

k.  Whether Plaintiff and the Class are entitled to damages and/or equitable relief.

77.  **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical class member. Just like every other class member, Plaintiff provided data to treatment providers and Defendant allowed bad actors to request, access, view, and take Plaintiff's data from Plaintiff's treatment provider without a lawful purpose and only a nefarious purpose to profit off of the records. Plaintiff's injuries are similar to other class members.

78.  **Adequacy**. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for herself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

79.  **Superiority**. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy.

Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

80.     **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), Defendant, through its conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

### COUNT I
### Negligence

81.     Plaintiff repeats and re-alleges paragraph 1 through 80 above as if fully set forth herein.

82.     Defendant had full knowledge of the sensitivity of the Plaintiff's and Class members' patient records, and the types of harm that Plaintiff and Class members could and would suffer if Defendant permitted the information to be wrongfully disclosed.

83.     By participating in the TEFCA and Carequality networks as an Implementer, Defendant owed a duty to Plaintiff and Class members to exercise reasonable care in obtaining, securing, protecting, and safeguarding their patient records. Defendant owed a duty to prevent the patient records from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

84.     Defendant was required to prevent foreseeable harm to Plaintiff and Class members, and therefore had a duty to take adequate and reasonable steps to safeguard Plaintiff's and Class members' patient records from unauthorized release or theft. This duty included: (1) designing, maintaining, and testing its data security systems, data storage architecture, and data security protocols to ensure Plaintiff's and Class members' patient records were adequately secured and protected; (2) implementing adequate vetting procedures and processes that would detect illegitimate access requests in a timely and adequate manner; (3) timely acting on all warnings and alerts regarding security vulnerabilities and potential compromise; and (4) maintaining data security measures consistent with industry standards and applicable federal and state laws and other requirements.

85.     Defendant had a common law duty to prevent foreseeable harm to Plaintiff and Class members. The duty existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices of Defendant in its collection, storage, and use of patient records. In fact, not only was it foreseeable that Plaintiff and Class members would be harmed by the failure to protect their patient records because of the prevalence of malicious actors' attempts to steal or gain unauthorized access to such information for nefarious purposes, but Defendant also knew that it was more likely than not Plaintiff and Class members would be harmed as a result.

86.     The injuries suffered by Plaintiff and Class members were proximately and directly caused by Defendant's failure to follow reasonable, industry standard security measures to protect Plaintiff's and Class members' patient records.

87.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class members, patient records would not have been compromised. And as a direct and

proximate result of Defendant's failure to exercise adequate and reasonable care and use commercially adequate and reasonable security measures, Plaintiff's and Class members' patient records were accessed by ill-intentioned individuals who could and will use the information to commit identity or financial fraud and otherwise use the information to the detriment of Plaintiff and Class members and their rights to privacy and confidentiality. Plaintiff and Class members face the imminent, certainly impending, and substantially heightened risk of identity theft, fraud, and further misuse of their personal data.

88.     There is a temporal and close causal connection between Defendant's failure to implement security measures to protect patient records and the harm that Plaintiff and Class members suffered and will continue to suffer.

89.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; the risk of public knowledge of their diagnosis(es) related to the exposure of the identities of their health care providers; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on illicit markets; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing transaction records, bills, claims information, financial and credit information, among other related activities; nominal and general damages; and other economic and non-economic harm.

## COUNT II
### Invasion of Privacy – Public Disclosure of Private Facts

25

90. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-80, as if fully set forth herein.

91. Plaintiff's and Class members' patient records contained highly sensitive and confidential information.

92. Defendant's Data Breach was highly offensive to Plaintiff and Class members and reasonable persons.

93. Defendant's Data Breach was an intentional act of public disclosure of private facts.

94. Plaintiff and Class members were damaged by Defendant's invasion of privacy and public disclosure of private facts.

### COUNT III
### Unjust Enrichment

95. Plaintiff repeat and re-allege the allegations contained in paragraphs 1-80, as if fully set forth herein.

96. Plaintiff and Class members do not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

97. Plaintiff and Class members conferred a benefit on Defendant. Specifically, they provided patient record information and agreed to allow network access of their records to allow treatment providers to share their records to participants in the network for permissible purposes, which Defendant shared with unauthorized persons for monetary gain. The benefits of electronic records result in reduced transaction administration, and treatment costs, which benefit users and Implementers, like Defendant. The alternative was for Plaintiff and Class members to insist that their patient records be kept off the network, which would defeat the network effects that the

TEFCA and Carequality network are designed to foster. Defendant abused its access to networks, and the trust of network participants, to unlawfully profit from the system and its contributors. If trust is lost, then the whole system breaks down.

98.     Defendant accepted and retained the benefits.

99.     Defendant disclosed Plaintiff's and Class members' patient records through inequitable actions and omissions. Under the circumstances, it would be unjust for Defendant to retain the benefits that that it received from this wrongful and conduct. Plaintiff and Class members have a superior equitable interest on the proceeds of Defendant's wrongful conduct because the proceeds were gained by profiting from their information, and invading their privacy, and the ways in which bad actors used the patient records to cause injuries to Plaintiff and Class members, such as by identity theft, invading their solitude with advertisements, being denied credit applications, getting a claim denied, or not being denied a job opportunity because their patient records may ultimately end up in the hands of identity thieves, advertisers, lenders, insurance companies, and employers.

100.    Plaintiff and Class members are entitled to full refunds, restitution, and/or damages from Defendant and an order disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct alleged herein. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class members may seek restitution or compensation.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff, on behalf of herself and the Class, requests that this Court award relief as follows:

27

A. An order certifying the class and designating Plaintiff as the Class Representative and the undersigned as Class Counsel;

B. An award to Plaintiff and the proposed Class members of damages and equitable relief with pre-judgment and post-judgment interest;

C. Declaratory judgment in favor of Plaintiff and the Class finding that Defendant owed, and continues to owe a legal duty to secure the sensitive personal information with which it is entrusted, specifically including information obtained from its customers, and to notify impacted individuals of the Data Breach under the common law, the FTC Act, and HIPAA; that Defendant breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and that Defendant's breach of its legal duty continues to cause harm to Plaintiff and the Class;

D. Injunctive relief to employ reasonable measures to secure patient record information;

E. An award of attorneys' fees and costs as allowed by law; and

F. An award such other and further relief as the Court may deem necessary or appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all such claims that may be so tried, with the maximum number of jurors permitted by law.

Dated: March 24, 2026                          Respectfully submitted,

*/s/ Jeff Ostrow*
Jeff Ostrow (FBN 121452)
Andrew Hausdorff (FBN 106848)
**KOPELOWITZ OSTROW P.A.**

28

One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com
hausdorff@kolawyers.com

Mariya Weekes (FBN 56299)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (866) 252-0878
mweekes@milberg.com

*Attorneys for Plaintiff and the Putative Class*

29